Case number 23-1196 et al. Louisville Gas and Electric Company and Kentucky Utilities Company petitioners versus Federal Energy Regulatory Commission. Mr. Jones for the petitioners, Ms. Masniak for the respondents, Mr. Bain for the interveners. Good morning, your honors. You may please the court. Christopher Jones for the petitioners. Two and a half years ago, this court affirmed several important aspects of the commission's sunset the de-pancaking subsidy but vacated the orders because the commission failed to address the effect on rates prong required under the public interest analysis under the commission's regulations. On remand, FERC commits the exact same legal error but in reverse, compounding it by narrowly looking only at the effect on rates. FERC's steadfast refusal again to balance the required public interest factors is wrong, but even if it isn't, FERC's analysis within the prong suffers multiple independent errors, each of which is a basis for vacature. I'd like to spend a moment on the 203-B standard of review before addressing FERC's many rates analysis errors. On the standard of review, 203-B operates differently than 203-A. 203-A is the merger review clause while 203-B is, to quote this court in Kentucky Municipal, is where we find the power to adjust merger conditions. Now FERC is arguing today that its 203-B authority empowers it to review the requested modifications entirely independent of the original merger. We think that's contrary to the statute and the case law, and before I proceed, I want to be very clear about something. This dispute is not about whether the commission should analyze all three elements of the public interest analysis. We agree that it should. The question is how, and that is our today, not about whether all three elements should be considered. On that note, the statute itself says this contains a tie back to the original merger. It says the commission may issue such orders supplement to any order. It clearly references back to the original order, and we know that as well from the case law. Not only Westar cited extensively in the papers, but any order would include actually not just the original order, but a supplemental order, correct? Any, I'm sorry, which am I, I'm sorry, I didn't follow the question, your honor. So the relevant language is any order. Yes. Any order would include both the original merger order and also a supplemental order like the withdrawal order, correct? Yes, your honor. So any order means referencing back to prior orders. Yes, so any order. We have a supplement to a supplement. We do. Order, which Westar didn't involve. Well, not strictly. Westar did not involve because you had the original proceedings, and then that case was about the follow-on proceeding. That was sort of like the withdrawal order stage. And so what is your textual argument that an order here doesn't allow them to look as a reference point to the withdrawal order? Well, I'm not sure that's what they did, your honor. What they said, what I read the orders to say is we look exclusively at what's happening specifically in this case. We look at before the removal of de-pancaking, after the removal of de-pancaking, and that's all we need to look at. That's what the new test that they claim to employ here does. The de-pancaking came in as part of the withdrawal order. It did. Okay, so the before de-pancaking would be when you're still in MISO. Correct, but that of course was derivative of the original merger. Supplemental order. Right. The prior supplemental order. Well, right, but again this is, there's certainly at this point 27 years after the merger is part of the complication here, but we don't look back necessarily. If we're going to status quo ante, which the commission seems to suggest we do, we have to go back at least to the merger and acknowledge that before the merger there were no de-pancaked rates. Customers paid pancake rates before the merger. They should pay after the expiration of the subsidy condition. So the fact that there was a, that we used a separate mechanism for mitigating horizontal market power through MISO membership, doesn't change the fact that this has always been derivative of the original merger. And the case law said. That's not a textual argument. That's sort of a challenge to the substance of their reasoning. Well, admittedly, it does flow to that, your honor. I mean, obviously. I'm just trying to understand your textual argument. I don't understand. You spent time in your brief insisting that the statute forbid them from looking at the withdrawal order, comparing two conditions before and after the withdrawal order, or conditions would have been upon withdrawal and had to only look back at the merger order. But now the argument I hear is you may need to look at the whole thing and the effect on competition and a holistic approach. Well, your honor, so if we're going back in time, our position has been you have to go back to the merger. The MISO membership, the MISO withdrawal was a step along the journey, but we clearly have factored in. Now we've adopted a separate means of mitigation. And so we have to, at that point, 203B has to say we go look at the original transaction. Textually, where do you get that? Well, textually, your honor, obviously 203B is fairly sparse, but we think supplemental order refers back to the original order. Again, not divorced from the supplement. Well, it is. And I don't, again, we don't have a lot of case law on 203B to begin with. You agreed at the time of merger to address the competitive concerns and other concerns by going into MISO. And then your client asked to leave MISO and the commission said, well, the only way we can do that and you haven't challenged that analysis here is by having you do this, de-pancaking. And now you're trying to remove yourself from the de-pancaking. And that's what this order is addressing. So it seems a bit artificial to say that there's a base that in analyzing what conditions of any should be imposed upon releasing you from the withdrawal order that they can't look at whether this new position that you want, the new terms that you want, would impose or continue and assure the conditions and protections, both for competition and the public interest, that the withdrawal order was implementing. That's your position. They can't look at that. Well, it's not, your honor, it's not that they can't look at it. It's what they've done here is they can't look in isolation at the removal of de-pancaking as a 203 jurisdictional event. And that's what they've done here. They said, we really don't care what happens before you filed this application in 2017. We just care that rates went up as a result of you removing de-pancaking. That's all we need to care about. That's what the commission did in both orders is to say, that's how we implement the effect on rates analysis. And that narrow view divorced entirely from the history of the case, we think is wrong. But your honor, if I might... They're only allowed to go back and look at the merger agreement. Then the only thing they would be allowed to consider would be the effect on competition. Is that right? If they were to compare it with the time... Not at all, your honor. I think this court decided that issue, we're not contesting that at all. I'm having trouble reconciling your reading of the statute with our prior decision for precisely that reason. Well, again, so the statute itself... Couldn't have sort of the public interest de-pancaking the rate effect analysis. If you were just back at the merger stage, they were focused there on the effects on competition, which obviously affects rates. Well, I think the best way to look at first orders is they've divorced themselves entirely from the history of the case. And that there's just no bearing, there's no basis for that in certainly the 203B case law. If we read it and it does not portion itself entirely from the history of the case and not ignoring the starting point of all of this, then that concern would fall away. Well, I don't think so, your honor. But again, perhaps I should move on to the actual merits of what they did here, even if the commission disagrees with me on the actual standard of review. There are a number of issues that... Well, first of all, before I leave the temporal issue, first failure to balance the other factors is a critical element as well. This court said in its prior decision, even if an inquiry into rates would favor keeping de-pancaking into place, which is what FERC says here, that would not dictate the outcome of the commission's full public interest determination. But we read the commission to have refused to consider all of the other factors. So the commission said it was considering all of these factors. And I think that your briefing, you pretty much concede that they considered the public interest factors. You just say that they should have balanced them. And I'm having trouble understanding what the difference is between balancing and considering. They said they were considering them, your honor. If I might quote from JA 251, this is paragraph 18 of the remand order. They said, even if... So they're resisting, I read them to be resisting this court saying, I don't have to consider these other factors. But even if we did, we're not convinced that the other elements weren't accepting the removal. That's all we get from the commission in paragraph 18. That's not balancing and saying, of course, we now must recognize the elephant in the room, that the competition... What about the rehearing? The rehearing analysis... JA 305. JA 305, yes. That's paragraph 36 and 37 of the rehearing order. But what I read the commission to be saying there is, the court told us all we have to look at is rates. And I think they say fairly explicitly in those paragraphs, I'm not looking at competition anymore. And the competition, again, this is the difference between a public interest analysis and a very narrow interest analysis about the interests of one specific group of parties. And so the commission says, I don't have to look at competition anymore. But again, specifically, when the commission says that the effect on competition at that point has to be part of the public interest soup, if you were. And then the commission doesn't deal anywhere with those issues and recognize the history of the case. In fact, that this court affirmed that the market power origin story of this no longer supports its continuation. So the question then is only, do we have an adverse effect on rates or do we not? And the commission does two things, and I think they're both wrong. First on benefits. But do you find that there is any particular way that the commission was supposed to go about its analysis though? Yes, Your Honor. I didn't see any mandatory language. So again, I don't want to delve back too far into the standard of review issue. But I think that the key element is that the commission should have at least acknowledged the history of this condition when deciding what do we do with this particular rate impact and how do we categorize it? The commission's precedent is just because rates go up, that's the first question in the analysis. It's not the end of the question. There are a number of steps the commission has to go through before it determines that it will deny an application based on the rates prong. In particular, are there offsetting benefits? Even if rates go up, we look for offsetting benefits. Even then, if you don't find offsetting benefits, you look for ratepayer protection. The commission got both of those elements wrong. But on the offsetting benefits, there were not enough sufficient to overcome the rate increase. Well, but again, Your Honor, let's talk about offsetting benefits. What the commission adopted here was what I'll call the same customer test. You have to look at the customer who's losing the subsidy and say, did they benefit from losing their subsidy? And we ignored benefits to other customers, benefits to the market. There is evidence in this record that the existence of de-pancaking results in a distortion of the market, and that was admitted by their expert in the record. And if FERC admits that, they failed to consider that. It's not enough that there will be some decrease in rates by some customers. The offsetting has to overweigh the increase in costs. What FERC is asking you to affirm is that you have to find to the specific customer who's losing the subsidy, and that's the reasoning that we don't think is right. In fact, we hinted at this argument the first time before this court, and I read the court's decision to say, we're not dealing with, or we don't find persuasive your circularity argument now because, and the court went on to say, you have other things in the record, including the effect on other customers' retail and transmission that would have to factor in. And the commission here says, I'm not dealing with any of those. That's just not accurate. They specifically acknowledged the impact this would have on decreasing the rates of other customers and found it to be, you know, vanishingly small. That's not ignoring. That's not putting it aside. It said it's a vanishingly small impact on all of the other rate payers and a very large impact on these rate payers. It's the same amount of money, and this is the point we made in our brief was this sort of diffuse benefits issue where if you take $5 and take it from one party, of course it's $5 to them. If you redistribute it, you're still redistributing $5. The fact that it's on a percentage basis, a lower impact to those customers who may get it back. But your argument is they didn't do it, and they did do that. At least I read it in the decision. Well. They did do it. So then now your argument seems to be that they put too much weight on one and too little weight on the other. Is that the argument? They dismissed those claims on the basis that those benefits accrue to the wrong party. That's the basis. They didn't say we looked and we don't find them enough or we find it highly persuasive that these customers will still be able to pay their bills and these won't. There's none of that actual merits balance. That's because I said it was so very, very small benefit to the other rate payers. I mean, we don't have an idea what their position would be if for some reason, and this may depend on numbers in a case, it would be equivalent or at least a material benefit to other rate payers. But when it was an immaterial benefit to other rate payers, what more are they supposed to do then? Well, again, your honor, I think they didn't put those two side by side, and we find that these were just not moved by the fact that these customers to explain and say, when we said it was small, we meant it was really, really small and not enough to warrant this effect on these rate payers where it was going up very significantly. Well, so your honor, so the benefit to the customers who are paying this, there's there are comments filed on the record, including by the Kentucky Public Service Commission saying, please let these customers, you know, these other customers, our retail customers in Kentucky, our other transmission customers who are paying this bill, it results in an unjust allocation of costs. Those are the words of the Kentucky Public Service Commission. The commission doesn't deal with any of that. What they say is, we're not going to, we're not going to pick up that issue or really delve into rates at all, because those are benefits to other parties. We here are narrowly looking at benefits to these customers who are losing their subsidy, and we think that test cannot be possibly justified on the record. Now, there is, even if you don't, candidly, your honor, by what we're selling on benefits, the rate payer protection piece. Suggesting questions, to be clear. Of course, of course, your honor, I didn't mean to suggest otherwise. But analytically, even if you get to the point where you find the commission did its job on benefits, the rate payer protection question is the next analytical question. And here the commission goes fairly far astray again. There's a, so when the commission, when the court remanded the case to the commission, the commission had on its desk, so to speak, a stack of signed settlement agreements between the company and the customers providing exactly that grandfathering that was at issue in the court spent so much time on in the last case. This is the, it's called the transition mechanism. It is called a transition mechanism agreement. Still, we still use that label in the settlement versions. How much longer will that go for? So it depends on the term of the specific agreement. They're all in the record, starting at JA 1099. Again, so those were done before the court issued its last order. Some of them go out 10 years. Some of them in the infamous hydro facilities go out much longer than that because the parties didn't have the benefit of the courts sort of weighing and calling balls and strikes on all the various reliance interests that were at issue in that case. So 10 years from now or 10 years from when? Again, somewhat, yes, they were intended to start when they were signed back several years ago. So the term of them would certainly not start now. But time having passed, of course, we'd have to sort of look at them at the time that they were signed. But the point is, there's reference to some 402 rate payers who have had the benefit of 402 pancaking but are not in the transition mechanism. Is that correct? They had no reliance interest? That's right. So let's talk about the Venn diagram of this case. The protected class was entire class of rate schedule 402 customers. There are 16 customers and there's a helpful chart at JA413 that goes customer by customer. JA413 is a chart customer by customer. What you'll see is 16 different 402 customers. 12 of them had signed settlement agreements or were covered by signed settlement agreements. The only six that don't are customers that don't have their pancakes today for a few reasons. Several of them take their power from the Tennessee Valley Authority. So they don't take power out of MISO. The other one has left and joined the neighboring PJM market. And the two remaining are wholesale customers of ours. They don't get their power from MISO. You cannot have an adverse impact on rates by removing something that the customers aren't using. So that's the Venn diagram. They've expanded this to cover people that aren't using it. And then in a footnote in the rehearing order, they say we have to protect those customers. So I just want to be really clear on this. Of those six, there's only two that would still benefit from the continued deep pancaking ordered by because of their wholesale customers? They are our wholesale customers. They get their wholesale power from us, not MISO. So they don't have, they're not claiming a, in fact, your honor, only from you. So they don't have a deep pancaking concern. Is that your, is that right? I'm sorry, your honor. I missed the question. They're only getting it from you. Does that mean they do not have a deep pancaking? Right. As a factual matter, they are not pulling power from MISO. So they don't need to be reimbursed. Anyone else that they would have a deep pancaking issue that, that, FERC's remedy would address? To my knowledge, there's nobody that FERC's remedy would address that isn't covered by one of those settlement agreements that was pending before the commission. And was that information provided to the commission? Specific information about these six and who would benefit? Well, yeah, well, the specific customers are in the record. Remember though, the commission didn't hold a case on remand. They didn't even ask for the submitted. I mean, it's, it's, it's in the record what the protections are for each customer and they're under those transition agreements. And so it's absolutely before the commission to know that. In fact, the same day, and this is the, the, the analysis that, that candidly boggles my mind on the same day, they faulted us for not offering a rate payer protection. They dismissed those transition agreements as moot. Well, the two things can't be true. We offered, we proffered a, an agreement that held each customer harmless for their reliance interests in, in some cases, well into the future. And the commission says, I'm not going to acknowledge that I'm going to fault you for not submitting a rate payer protection. Okay. One more time. Two are wholesalers. Two are wholesalers. I'll give you specifics your honor. The, the, the names. So, uh. What are the names? You said there were two that are, sorry, are they now in PJM? Is that what you said? Okay. So one is in, has moved to the PJM market. That's the city of Falmouth. Two are continuing customers of ours. That's the city of Bardstown and Nicholasville. And the three remaining are still customers of the Tennessee Valley Authority. None of those customers have even intervened in this case from day one. They don't have an interest in it. So when FERC says we're out looking for them, we're protecting them. They're not even in the case. So I'm not sure what, how are you, when we say that the transition mechanisms don't cover the waterfront, the commission didn't even really look at. I would have expected them to go back and say, well, here's what we see here is the problem. The only thing they give us is a footnote in the rehearing order where they say, well, there might be contracts that were entered into since then. And of course we wholly object to the notion that we should be deep pancaking going forward with new and allowing customers to establish new reliance interests after this court has affirmed that the condition giving rise to it no longer holds. So again, even if you go through, when you go through the analysis, if you find that there was, we think we went on benefits, but we certainly went on the fact that there was ratepayer protection for each customer at issue. All right. Thank you. Thank you very much. We'll give you a few minutes on reporting. Your honors, may it please the court. My name is Kim Smazniak on behalf of the respondent, Federal Energy Regulatory Commission. I want to start with Judge Millett, your questions regarding the focus of the commission's analysis. And there we agree with the line of your questioning. We the commission's precedent as running headlong into this court's decision in Kentucky Municipal Energy Agency. In essence, what petitioners are asking the commission is to be restrained in the scope of its analysis such that it has to discount those effects on rates. And we read the Kentucky Municipal Energy Agency as requiring the commission to look at and give weight to those rates. And deep pancaking did not exist at that time. And therefore, those rate impacts would essentially be nonexistent if that was the sole locus of the commission's analysis. Thus, the commission viewed that approach as being inconsistent with the remand instructions of the court. Is that what their reading would really mean in practice? If they want to go back to the time of the merger, the court could say, well, at that time, there was a real competition problem. And so the effect on rates would have been astronomically worse than even what we're talking about here. I'm assuming, I'm no expert in this, but it seemed like given the original concerns at that time, the concern about competition was de facto an enormous concern about rates going up very high, very fast. That's correct, Judge Millett. I believe that what they're proposing is that we're looking not back to the original circumstances for the purposes solely of that rate analysis, but with respect to competition, they certainly argued we should consider the developments that have occurred subsequently. So we're going to look at today's present conditions and comparing whether or not there's a need for further mitigation on under 203B, but they don't want to look at what are the today effects of their proposal. And so I think they're a bit picking and choosing how they want that analysis to work under their argument. In any event, the commission looked at the statute itself and read 203B as containing incredibly discretionary language that does not constrain the scope of the commission's analysis. But you all look at, you explained that under 203B that your analysis is permitted, but it's not necessarily required. So is there a distinction there? And then if so, have you adequately explained why you're kind of going against Westar like your original analysis? Thank you for the question, Judge Childs. Yes, we view this as permitted, but not required by that text. The language is the commission may from time to time for good cause shown make such order supplemental to any order made under this section as it may find necessary or appropriate. We do not see a particular standard there as to how to do that analysis. The commission has constrained itself through its precedent that it will do a public interest analysis in the same manner in which it considers those three prongs, those same set of prongs will be considered as part of its good cause analysis. So if I agree with you that you're permitted to do this type of analysis under 203B, have you adequately explained your departure from Westar? So the commission doesn't view Westar as controlling. We think we've been consistent with Westar. We also note that in the 2019 order, which this... What we're really at is that you're looking at pre and post merger versus pre and post this world, you know, in terms of rates under the proposal. And that's two different analysis because petitioners argued that your starting point should have taken in consideration the history of the merger. Yeah, so a couple answers for you. One, I do want to point out that the commission acknowledged that in its 2019 order, it read the Westar precedent in the manner petitioners argued for. However, in its subsequent, in these orders that are now under review, it acknowledged that it was departing from that prior reading of Westar and explained that in light of the purposes of the statute, that it viewed that this is the better reading and explained that departure. I will note that that 2019 order was vacated by this court. So whether it needed to do that, it still nonetheless explained that change from that prior explanation. Is Westar a supplement to a supplement case? Westar is not. And that was my second point, which is we didn't view it as controlling here. This is a case unlike Westar in which there have been multiple orders over time. And so to go back and skip over what has happened in terms of imposing additional conditions and look solely to that original transaction, that's not the fact pattern here. And therefore it's not on one-to-one with the case that was before the commission. And is that what your explanation is when you say on the facts of this case that that's your distinction there? Correct. Okay. Moreover, even when you look at the text of Westar did, it did look at what is the impact of terminating the relevant condition and look at that. And so if you look at Westar itself, the weight of the analysis wasn't solely looking at, it was also sort of taking as the commission did here, what is the change from the status quo? It looked back to what is the original merger conditions. It also considered what is the effect of this change that's being proposed here? And that is this same analysis the commission is doing here. It's looking at what is the effect on this change that is proposed. The status quo prior to that imposition of that change and then the effects afterwards. And that's a natural way in which as you're looking 20 years down from a merger to consider what are the impacts and what is the appropriate scope of the commission's review. When you say impacts, do you mean continuing impacts of the merger or just the impacts of this change? Of this particular proposal, which in this case, there's no proposal to change the merger. The merger is not really up for consideration at this stage of the game. It is done. It's been accomplished. They're fully integrated. So it's really before the commission at this stage is an elimination of one of the mitigation measures that was part of the package of things together that the commission found as a whole was in the public interest. And so the question is, is it warranted? Is that change, that termination of some of those conditions, is that warranted? So that was the nature of the commission's inquiry here. How under the commission's approach here, will the public interest analysis ever come out in favor of getting rid of prior conditions like here at the deep pancaking? Because if you're only going to compare to the people who benefit from something and you say, are you worse off if we take your benefit away rate-wise? The answer is always going to be yes. And I believe this is petitioners in perpetuity argument. And we have several responses that we offered petitioners on this point. The first is the commission's job here is to look only at what's before it, right? And so we rejected this because here, what they were offering is only a termination of this particular mitigation requirement. There is a number of ways in which they could change what they're offering. And the commission would then consider, what does that mix? And I think when you speak to... Such as? Such as, for example, they make much of the transition mechanisms. Those were not before the commission as part of what was being part of the applicant's proposal. So it wasn't on the table. They could come back... The charge was to go back and look at rates and then factor that into a comprehensive public interest analysis. Because the prior public interest analysis had just turned on competition. And so FERC chose not to reopen the record. So it had the full record before it. And so it had information about the transition mechanism as part of its decision making in applying and analyzing the effect of the rates on rates. And yet, it seems not to have acknowledged that for this transition mechanism, everyone who had a reliance interest, and maybe everyone who's still even subject to pancaking issues, has protection going forward for multiple years to sort of, on top of the protections they've had all the years since the merger, to transition out. And now they get to transition out into a much more competitive environment. Why wasn't that part of what the commission should analyze in determining the effect of rates, even on just these rate payers? The commission said two things. The first, it said those agreements were imposed by the commission itself as part of accepting the termination of the mitigation. And so having now vacated that order and those transition mechanisms only being responsive to the need to address the termination of the mitigation, those were eliminated. They are legally no longer in effect. Applicant could have withdrawn and give us a new application in which they choose to present them. So is there no transition mechanism in effect right now? No. Instead, there are refund orders that return back to the original deep pancake conditions based on the vacature of that. And so instead, they're getting, rather than just a subset of customers getting the benefit of those transition agreements, all customers who were originally subject to the mitigation measure are now back under those protective measures. And so that is the current status quo and refunds have already begun, as I understand it, to be calculated. And so the second answer the commission gave in addressing that transition mechanism is that there is this gap that was based on a 2019 determination of who had reliance interests. And there's no way for the commission at that point to determine that there are not additional customers who might have fallen within the scope of that if they hadn't erroneously eliminated the mitigation measures. And so for that reason, the commission also found those transition mechanisms deficient. Now, going to your original question, which is what could potentially come before, it's on the applicant really to determine the mix of mitigation measures and give the commission a record upon which it could weigh those. No one is saying we need one-to-one a return for everything that's taken away from one set of customers to then be given back to them in precisely, you know, that same dollar form. In fact, the commission in the balancing often looks at, you know, are there reliability benefits for these kinds of, you know, events that might outweigh. There's a host of different types of benefits that could manifest. There's also consideration of is this perhaps a transition mechanism could get close enough to addressing the interests of these customers if there was properly scoped. So there are a number of options. At the end of the day, the commission's job is to evaluate the mix of measures that the applicant puts before it. It knows what's in its commercial interest, and so the commission looks to that. I remember the action we had before the commission on the original record, these transition mechanisms, and so why couldn't, it seems odd that the commission here sort of didn't want to hear anything more about that when it, at the remand stage, it sort of want to close its eyes or ears to this very obvious way of dealing with the problem that had been in place. And so why wouldn't it have then allowed the parties, the interested parties, to make submissions as part of this analysis? Parties are allowed to make submissions, and there are, you know, comments and things submitted. In response to the remand, we get responses from what different parties think of what we've done, and there's an opportunity then, of course, on rehearing for the commission to revisit, fix things, and potentially change direction. And so we always have that opportunity to hear from the parties, even on a remand. Prior to the hearing, before they issue the first remand order, they allow party submissions. We, at that point, we would get rehearing on our order as part of the next step. It's a 30-day window, so that's the next thing we hear from parties. What I'm asking is, FERC surely has the discretion upon remand from this court to ask the parties if there's ratepayer concern, or its opinion acknowledges that there's going to be very high impact on the people that are protected by this, and pretty small on everyone else. But our order has been vacated in that relevant part, and so before we address this, does anyone have any more information about the effect on rates, now that we have a very, a more focused analysis? And you're saying they can't do that, they just had to decide and then have people do it on rehearing. I will say we can do it. We did not do it. Correct. In the discretion of the agency to direct its proceedings here, it did not. But it seems like you had this transition mechanism that was an appropriate vehicle, subject to conforming to our prior decision, appropriate vehicle for providing the very protection to the very people who had reliance interests. I'm having trouble understanding why that shouldn't have been part of FERC's analysis, and even if you want to say they had to wait until rehearing to raise it, that shouldn't have been a relevant part of the analysis here, because that addresses the very harm at issue. And you may beef with whether or not the commission on its own volition might choose to impose that as a condition, but the structure in which the commission looks at it is, what is the application before it? The application before it did not include the transition mechanism that is normally for the applicant. Now the commission could have chosen to put forward as a condition, you must also use these transition mechanisms, tweaked in ways to address the equities. This wasn't out of the blue. Everyone's fully aware of this. And the commission chose not to do that. And I would say the statute doesn't require it to. In this case, it chose to look at the squarely what is this application before it and deal with it, and then the applicant is free to come back if that is its choice. Now remember, these are entire, these transition mechanisms were negotiated among the customers, RS402 customers, under the view that the commission was going to remove that mitigation entirely. And so they were coming at that negotiation from that position, where agreements on what the scope of those should include, but was under that shadow of that particular decision of the commission, which was then vacated. And so there are good reasons to believe that that negotiation might look different. And the way in which the commission expects applicants to come to it in offering rate protections is to first to work with those who are adversely affected, come together hopefully with mutually agree upon conditions in which they can then, the commission can rule on them and understand these rate payer protections, for example, are sufficient. So that is one of the options that would be before the applicant is to proceed with that without the commission's prior or reverse decision hanging over those discussions. If I can turn to, I'm almost out of time. Very quickly, Judge Wilkins, you had a question about the balancing issue. The commission did balance the other factors. That's clear in its rehearing order. It also specifically looked at the competition. Where is that clear in the rehearing order? Let me give you the citations. In the remand rehearing order at paragraph 33, which is JA 305 to 306, the commission indicated it considered all the other factors in the public interest analysis, but did not find they outweighed the adverse impact on rates. Found the absence of negative impact does not equate to a positive benefit. Specifically with respect to the competition benefits that are raised by petitioner, in the rehearing order, again at paragraphs 36 to 37 and JA 305 to 306, the commission affirmed that it didn't need to do further analysis of that competition benefits as petitioner argued. It had already done the competitive analysis as a part of its 2019 order, and there it found that while there were sufficient competition, there was not a concern about competition, but there were no competitive benefits of the elimination of these mitigation measures. Though petitioners argued that we should consider this a benefit, in fact, when you look at the 2019 analysis of what was in the record, the commission concluded that actually there were going to be some loss of some competitive supply. So while it was a small enough margin that it didn't matter to the overall conclusion on that prong, it wasn't a benefit that would outweigh those rate effects. Great, thank you very much. Thank you. May it please the court, my name is Jeff Bain, arguing on behalf of the Kentucky Municipal Intervenors, not-for-profit utilities serving residents and businesses in 13 communities across the Commonwealth. And I'd like to just pick up briefly on this transition mechanism issue. I think as FERC explained, it correctly treated these as fruit of the poison tree of the now vacated orders, but it did address in paragraph 31 of the rehearing order, if it were to consider them, it would find them inadequate as part of its overall balancing to offset the significant adverse rate impact. Why would they be inadequate? How is that rational? Well, I don't think you have to look further than the refund report just to those Kentucky Municipals subject to the transition mechanisms. There were $13 million in refunds for the period that those transition mechanisms were in effect before those orders were vacated. So there's no actual question that those didn't fully offset the rate impact. So then that just becomes, how does it factor into FERC's overall balancing? And FERC looked at, it dismissed those, but it said if we did consider it, that wouldn't be a big enough part of our overall public interest balancing. And the question before this court obviously is not to come up with its own public interest balancing, but to determine whether FERC's was an abuse of discretion under its broad inflexible Section 203B. The problem with just looking at people who have a benefit, if it's taken away, are they going to be worse off? It means there's always going to be an answer to that. It's always going to mean you can't change things. And it seems to me, while that's no doubt a very relevant component of the public interest analysis, it has to be richer than that. There has to be a way to consider easing out of issues like this, like a transition mechanism going forward or other measures. But I don't understand, FERC, what else could be done so that the same answer wouldn't, you know, a hundred years from now would be the same answer. We can't take away the de-pancaking because then they'll have to pay more. I think FERC did look at more than just the impact on Kentucky Municipals. It did consider the company's argument that their proposal would benefit their own retail customers, but found those small dispersed benefits not adequate. FERC looked at the impact on competition here. As FERC counsel explained, there weren't any positive benefits to competition here. You can imagine in a different set of circumstances under a different proposal, there could actually be positive benefits on other factors, whether to reliability, something else. What about the effect on when there's so much competition, then the rate payers who no longer have de-pancaking at least have a lot more options for purchasing. Shouldn't that have been factored in? So not just asking whether de-pancaking has an effect on competition, but asking does this increased competition that's been found here, how does that factor in the impact going forward on rate payers? Because ordinarily increased competition helps reduce rates. Right. I think FERC looked at the record here. Again, I don't think there's a factual dispute here that rates will be going up for Kentucky Municipals if rates were re-pancaked, notwithstanding the changed competition landscape. It seemed like it was just an analysis. It'll go up whatever this pancaking cost is that we have been avoiding through the de-pancaking. But I think it's more than that, because the evidence in the record, for instance, this was cited in the court's prior opinion, the 47 percent rate increase to one of the Kentucky Municipals, Benham, a small community of about 500 people, 47 percent. That 47 percent is against a baseline of overall costs with the increase to transmission rates from re-pancaking factored into it. So there was evidence in the record about the overall effect on rates, not just the fact that, yes, if you re-pancake rates, that's going to add transmission charges. There was analysis, and a lot of this in its competition section, on what the overall impact on rates would be. And that factored into FERC's public interest balancing that it did here based on the record before it. And one other point I'd like to make on the overall, the companies now make a broad attack on this concept of de-pancaking as somehow improper, but I think their own actions belie that. They didn't have any problem with de-pancaking in 2006 when they sought to get out of their promise to continue participating in MISO, and they haven't sought to terminate any of the de-pancaking provisions in their rate schedules for other customers. It's only after a number of Kentucky municipalities stopped buying their power from Louisville Utilities and sought to develop their own power supply arrangements that they targeted the de-pancaking provisions of rate schedule 402. And I think that factors into this framing of de-pancaking as somehow anomalous. It's not. FERC determined it to be in the public interest. FERC determined that the cost allocation implications, recognizing the benefits the companies got from their desire to leave MISO, all balanced to be in the public interest. And what FERC's public interest balancing did here was maintain that. And that's consistent with its role under Section 203b with the proposed modification, again, to the 2006 MISO withdrawal order. There's not a proposal to change something from the original 1998 merger order. So FERC's looking at the impacts of the proposal before it was proper and well within its discretion. Any questions? Thank you very much, Council. Mr. Jones, we'll give you three minutes on rebuttal. Thank you, Your Honor. Let me pick up where Mr. Bain left off. He mentioned the City of Benham, and I'm glad that he did. The City of Benham is the source of the 47 percent number. The City of Benham has a signed transition agreement at JA 1129. Nowhere does the Commission acknowledge that and say, perhaps there's a gap, there's daylight, maybe the coverage isn't enough. That 47 percent could be zero under that transition agreement. But we don't know, because FERC never even bothered to ask the question. They never put those agreements next to each other or next to their concern about rates going up. Why didn't you, in rehearing, put all of that in and say, in fact, it is zero? Well, first of all, tell FERC. Are these agreements still in effect? They're not, Your Honor. The Commission dismissed them as moot. So why, on rehearing, wouldn't you have gone in and said, look, here's the offset. You want an offset? Here's the offset. We've got all these agreements. Sign off on them. Make them part of this agreement, part of your order. They'll all be taken care of. Well, we did, of course, at length in our rehearing, say you should have focused intently on these transition agreements. You should have picked them up and you should have looked at them. The record wasn't open. That's a different argument than saying these will offset or materially offset or whatever. I understand. I guess the issue is that the factual record wasn't open. They never asked for briefing. They never asked for papers. They never asked for new evidence. You could have pointed to these things that are in the prior record and said, you want offset? You got offset. It's right there. Well, right. So the 47% was never our number. I'm not sure I could tell. I'm not asking whose number it is. I think it's all of these, you would say, all of these folks that at least are still having the consequences of pancaking, that if you're right in describing it, I think it's your position, it sounded like earlier, that these offset. These will offset going forward. They'll phase out over time. But going forward, they will offset the consequences of de-pancaking. Of re-pancaking, I guess. Yeah. So we didn't do it to the dollar degree in our request for rehearing. Again, our issue at that point was largely, you know, we were operating sort of at a higher level. The commission refused to even pick them up, much less hold an argument about what was covered and what wasn't. In fact, let me also mention Mr. Bain. I don't understand what refuse to pick them up means. If you're at rehearing and you can say, your decision said there's nothing to offset. There's no offset of this harm to this group of rate payers. Here it is. Please consider this. That will solve the problem. If you'd said that, then you'd have that argument. The commission didn't. You can't sort of go, they didn't do it on their own. No, no, it's not that, Your Honor, if I may. The commission didn't say, we find them insufficient and therefore the burden was on us to say, yes, they were. The commission just said they're moot. We put them aside and we say, you never offered us any mitigation. That was it. Again, they never made a factual determination about the transition agreements for us to take issue with. Was it error for them to say that they were moot? I'm trying to figure out what error it is that you say that the commission made. The commission, again, today, again, faults us for not offering affirmative rate payer protections as required by the precedent and regulations. That is precisely what we had done with those agreements. We had filed them. We had signed them. And so it was error for them to ignore the fact that they mitigated or their entire purpose of mitigating was to mitigate this impact. Again, we don't know. The commission never asked the question, did the city of Benham go from 47 to zero or not? Where in your brief, do you argue that it was error for the commission to have vacated or dismissed those agreements? So there's a separate, it is in the brief, Your Honor. There's a separate order that dismissed them on the same day that they issued the rehearing. In the first remand order, there's just a footnote that says, oh, by the way, these are moot. And we, on rehearing, said, well, you can't just say that. Those are the rate payer protections. You've got to deal with them. And so they issued a separate, because they had been filed in a rate docket, they had to issue a separate order. So they did. On rehearing, there were two orders that day. One dismissing them as we appealed. Also, it's here in front of the court. And the remand rehearing order, which we talked a lot about the fact that these transmission agreements, these transition agreements should have been considered. Now, the other thing I will just quickly say, FERC mentioned all sorts of paths forward that we might employ to, you know, get over this test somehow. None of that rationale, none of what we just heard from the commission counsel is in any of the orders. There's no discussion at all about what flaws could be cured in the future. I mean, we are stuck with this test that we just don't think that we could get over. And then the last thing, Your Honor, is about just and reasonable rates here and sort of, you know, the rate increases. These rates are the same rates that everyone else is paying. The removal of the subsidy just puts these customers back in the same position that everyone else that uses the MISA transmission system and uses our transmission system has to pay. It's just the restoration of what FERC is determined to be just reasonable rates. Illinois and Indiana companies that are not, that you're keeping the pancaking in for Illinois and Indiana. Well, first of all, none of those issues were at all, the commission didn't rely on any of that. Is that accurate? Your Honor, I believe, I don't... It's more accurate than your argument that they're just paying the same thing as everyone else. It's just not, it's not accurate. Well, so I don't know, I don't have a good answer for you on whether those TM, those, the other rate schedules for deep pancaking consist, continue for those customers. I will say the commission certainly didn't rely on that order. That's an argument that the intervener has sort of inserted into this. So the commission can't certainly rely on it and I didn't hear them to. No, no, I'm responding to an affirmative argument that you're making. Yes. And I'm asking you how the argument that you are making to us is accurate, given, unless you're telling me they're just wrong about continued deep pancaking for Illinois and Indiana customers. I'm not going to say they're wrong on that, Your Honor. So then how is your argument right? Well, there's a host of, again, I suspect, again, I don't know what the future of those other transmission agreements or those deep pancaking agreements are. But to the extent that we can establish that they are no longer needed and those other agreements may have other tails on them or termination provisions. And again, I don't want to, I'm not well equipped to answer that specific question because it wasn't for the commission. But the point is, when we restore, this is not a situation where we are out there just trying to increase somebody's rates. We are just putting, restoring the just and reasonable rate, which FERC has set as the reasonable rate for using the MISO transmission system. And that's all that we're talking about here. I guess it's still if, I mean, sort of one of FERC's main goals is to make sure that transmission providers can't pick and choose who gets what rate. And if there's evidence in the record that you're not disputing that Illinois and Indiana are getting effectively a different rate because they get deep pancaking than these folks, why isn't that a pretty material thing to be concerned about? Particularly when your brief is filled with cost causation and these rates are all just fine when you're not offering them uniformly to all your customers. I think the struggle that you're hearing from me, your honor, on this is that the commission never asked exactly that type of question. And that the commission council says we're looking to restrain them. Just the opposite. We would have hoped the commission would have asked exactly that kind of question and say, are you treating all... You just have no basis for your arguments to us. I the unreasonableness of FERC's actions. And there's an at least non-disputed fact in this case about that seems to be inconsistent with the arguments that you're offering to us. And so I don't, I'm understanding, how could I write an opinion that says FERC was unreasonable because the rates are all fine, cost causation principles. We need to equalize it for everybody when that is not, and you can't assure me that that's the reality on the ground. The fact that you've picked at least two states that you're happy to continue de-pancaking for. And we don't like to let transmission providers pick and choose who their favorites are. Yeah. Again, your honor, that issue was never before the committee. And again, had the commission... I'm aware that it was... I understand your... And I understand the basis for your arguments. If you, I mean, when you made these arguments, were you aware of this Illinois and Indiana issue? When we made the argument, the specific argument that we should be restoring them to just and reasonable rates, I don't think we found it incredibly probative at the time that there was potentially remaining de-pancaking that would may have expired on its own terms that we elected not to make an issue out of at this point. But I just wanted to make this simpler point, and I understand the point that your honor's about how can we say that you haven't been somehow treating similarly customers on a different basis. The point I was trying to make was probably a simpler one, and I didn't do it well, which is that I want to make sure that we just understand that these customers have been granted the ability to have their MISO charges reimbursed. And we're simply talking about taking that reimbursement now that it's the law of the case that the competition analysis no longer requires it, that it's time to sunset that. And again, we're not saying that the commission should be restrained in its rate analysis. We think the commission should have looked at all of these issues on remand and permitted an extensive discussion of rates. Instead, they summarily rejected our transmission agreements as moot and said, that's it. There's some issues with those transition agreements in our prior opinion. Has there been any effort to adjust to address this? No, your honor, because the commission dismissed them as moot. They were no longer before the commission. Yeah, maybe I may understand the whole origin story here. I had thought those were agreements that the companies and utilities, that your client and utilities had worked out and then submitted to FERC together. Is that not accurate? Okay, so let's just quickly on that. It wasn't something FERC could impose. I just understand how it works. Yeah, FERC's argument has been, well, it was their idea, not ours, and therefore it doesn't count, which I don't think is terribly persuasive. But what happened was we filed our application. We did not say, we will transition them out. The commission in 2019 said, we grant your application, but only if you transition them out. And we didn't seek a hearing of that. We said, okay. Now there was subsequent litigation about the scope of that, as your honor well remembers. So when the court order, when the mandate arrived at the commission, we had already negotiated based on the existing FERC record, a new set of transition agreements we had filed them. Again, so procedurally, we did offer them. We had signed them, they had signed them. Now each party did reserve its rights in that agreement to make any modifications on the margin in response to the court's order. But the commission said, nope, they're all moved, dismissed procedurally, so they're gone. I want to make sure I'm processing this. Yeah. Those agreements had been updated after our decision and then were submitted to the commission. So those agreements were compliant with our decision or those were the pre-decisional? Those were pre-decision. So I would... Wouldn't that have been accurate for FERC to say, the court said there's some problems with those. So why do you want me to look at those again, as opposed to, why wasn't, so I guess back to where I started and this may be as a process problem on my end, why wasn't it on you at that point to update the agreements to address those concerns and provide those deferred? Well, so when we, when the mandate arrived, we had those settlement agreements, they were sitting there before the commission. We had no idea what the commission would do, whether they would hold procedure or not. And then the remand order just appeared and dismissed them. How long after our decision was the remand order? Oh, I think they sat for nine months. That was time for you guys. I mean, you knew you were going to have to do something with these agreements. Oh, I think you're right. And that's why it was written into the agreements that the parties may be able to petition for changes on the margin to scope it pursuant to the court's order. So you had time. To the extent that this is something you all work out outside the commission context and then provide to the commission. Well, except to the extent that at that point, Your Honor, the court had vacated the commission's order entirely. And so I think both sides were waiting on bated breath to figure out what the commission was going to do writ large. And so, but we just contend that, again, with those settlements before the commission, which are exactly the ratepayer protections that the commission talks about not being there. Except they needed to be changed. Well, they could have been, right? They needed to be changed. In order to comply with the court's order, right? In both of our favors. That's right. But there would have been procedure for that. We built it into the agreements. Procedure would have been what? I'm not being clear here, obviously. I apologize. Is the procedure something that had to go through FERC or could the procedure have been you and utilities, you and the customers get together, update the agreements and then let FERC know about them so that there is, in fact, this form of protection in place? Oh, I think at that point, Your Honor, having the court, having vacated the commission's order and frankly granted a win for the other side, I don't know that the other side would have signed new transition agreements complying with the court order now that they expected a new rates analysis. And maybe they could get out of this entirely. So what I, if I were to write the commission's order on remand, I would have said, we have these transition agreements in front of us. We are concerned that on the margins, they may not strictly comply with the court's balls and strikes on reliance interests. But we know that there's a, you know, that the party's reserved rights to modify them in that respect. Subject to those modifications, they are adequate ratepayer protection. And we could have, they couldn't say they're adequate until they saw the modification. It's like a chicken and egg problem here. I don't know how they can say they're adequate until they see the modifications. And you're saying we can't do the modifications until they say they're adequate. Well, again, I think if we, once they're there and the court has issued the order, the commission had both of those facts in front of them. They easily could have looked at this and said, we would find these agreements determinative, but for any daylight between, maybe relevant, relevant to the, to the, just the existence of a rate impact. But we are concerned about any daylight between them and the court order. And we asked the parties to address this. That would have been absolutely reasonable thing for the commission to have done. Instead, they just, again, dismiss them entirely as moot. And, you know, act again, then proceeded to fault us repeatedly in their orders and their briefs for not offering some sort of ratepayer protection when that's exactly what they are. I can't, it's hard for me to conceive of better ratepayer protection. I'm wondering why you couldn't offer. Here's the updated, that's signed by the other side for the reason you said, here's what we're offering. Here's what we're offering. We've changed these proposals that were before you last time and vacated as part of the order. They needed to be cleaned up and fixed. Here's what we're offering and give that to the commission. And the commission then could look at it and say, yeah, this will, this will work, or this will at least mitigate the effect on these ratepayers sufficient that when we do the big balance, both of overall ratepayer consequences or rate consequences and the public interest writ large, that this will suffice. But it seems like they just didn't have that in front of them. Well, all we would have done, as you correctly point out, is file the unexecuted. The other side wouldn't have signed them, presumably. So we would have just filed them. And so we would have been asking the commission to accept them over the But again, had the commission saying it's like you're all pointing at each other saying you didn't give us anything to offset. And so had you done that, you would have provided them. Here's what we're willing to do. Here's a way that this can't this is an answer to the imperpetuity problem. We're going to have it will go this long. It'll phase out maybe at the ends. I don't know how you write whatever you want. But that would have been us getting out ahead of the commission even considering the court's analysis, the commission and commission counsel concedes they had no process that opens no docket. They asked for no papers. And you could have filed this at the rehearing stage. You had plenty of time. We could have filed new agreement. Well, a new agreement would have tendered a new rate filing. The commission would have dismissed that as procedurally improper at the rehearing phase. There was just no way for us to go in and say, I mean, we would have had to start a new rate case and say, here are new agreements and then ask the commission say, don't worry, these are now compliant. But there was no proceeding. The commission had already dismissed them as moot. The commission opened no docket. We didn't know what the commission was going to do on remand, and they decided to just issue an order instead of hold a proceeding to talk about all of these issues should have been at play. That that is our argument that the commission should have undertaken that rate analysis. Thank you. Sorry, I've taken up a lot of your rebuttal time. What just what? Yes, you're on one just very small point. I did mention the five of the six. I wanted to be clear. There is one of the six customers that did intervene in this proceeding. I think I said all of them had not. I want to be very clear. There is one that has. So I apologize for that misstatement. But the rest of them. But again, all six customers, none of them have made a claim for deep pancaking that wasn't addressed in one of those filed transition agreements. Okay, the case is submitted.
judges: Millett; Wilkins; Childs